[Cite as *In re J.H.*, 2019-Ohio-137.]

COURT OF APPEALS
PERRY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | : | JUDGES: |
| | : | Hon. W. Scott Gwin, P.J. |
| P.H. AND J.H. | : | Hon. John W. Wise, J. |
| | : | Hon. Craig R. Baldwin, J. |
| | : | |
| | : | |
| | : | Case Nos. 18-CA-00008 |
| | : | 18-CA-00010 |
| | : | |
| | : | O P I N I O N |

| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Perry County Court of Common Pleas, Juvenile Court Division, Case Nos. 2016-C-251 and 2016-C-250 |

| | |
|---|---|
| JUDGMENT: | Reversed and Remanded |

| | |
|---|---|
| DATE OF JUDGMENT: | January 17, 2019 |

APPEARANCES:

| | |
|---|---|
| For Plaintiff-Appellant, B.B. | For Defendant-Appellee Perry County Childrens Services |
| JAMES S. SWEENEY | |
| James Sweeney Law, LLC | EMILY STRANG TARBERT |
| 97 S. Liberty Street | 401 Market Street, Suite 209 |
| Powell, Ohio 43065 | Zanesville, Ohio 43701 |

*Baldwin, J.*

{¶1}   Appellant B.B. appeals from the June 28, 2018 Order of the Perry County Court of Common Pleas, Juvenile Division, granting permanent custody of P.H. and J.H. to  Perry County Children Services.

STATEMENT OF THE FACTS AND CASE

{¶2}   Appellant B.B. is the biological mother of P.H. (DOB 6/25/10) and J.H. (DOB 10/13/14).

{¶3}   On August 19, 2016, a complaint was filed in Case No. 2016-C-251 alleging that P.H. was a dependent child. On the same date, another complaint was filed in Case No. 2016-C-250 alleging that J.H. was an abused child.   Temporary custody of both children was granted to Perry County Children's Services.

{¶4}   On March 6, 2018, Perry County Children's Services filed motions in both cases seeking permanent custody of the children.    A hearing on the motion was held on May 16, 2018.   While the children's father represented himself, he left the hearing before it was completed and is not involved in this appeal. Appellant and the father were never married.

{¶5}   At the hearing, Daniel Kelty, a licensed social worker with Wild Ohio Counseling Center, testified that he had counseled the two children in this case and had been seeing them for over a year. He testified that P.H.  has emotional regulation resulting from a lack of stability in her biological family. He further testified that she was "extremely parentified with her younger brother" and that J.H. had issues with anger and emotional regulation. Transcript at 17. According to Kelty, the children reported seeing substance abuse and sexual activity in their original home.  When asked what causes parentification

in young children, Kelty testified that often children become parentified when there "is a lack of parental structure in the home and that children will feel the need to self-regulate and become the parental figure when that parental figure is not present." Transcript at 18. He testified that the children seemed bonded and attached to their foster mother  and that she was responsive to his instruction regarding their mental health. Kelty testified that it was "paramount in their development and extremely important in their continued emotional stability" that the children maintain stability. Transcript at 19.

{¶6} Kelty testified that the children were originally placed with their grandparents, but that the grandparents had surrendered placement due to struggles with the children's behaviors including defiance and aggression. He testified that the children, in their current placement, were more stable and well behaved and that he saw significant improvements in their behaviors. Kelty testified that J.H. used to have a hard time with speck, but that he was able to make complete sentences. Both children had been diagnosed as victims of child neglect and child abuse and both needed long-term counseling. Kelty testified that visits with their biological parents would not be in their best interest and that he had witnessed increased trauma and problematic behavior when visits took place. Kelty testified that he believed that any change in placement would be detrimental to their stability and that while a maternal aunt had filed a motion for legal custody, the children had not disclosed a relationship to her during his one plus year of counseling them.

{¶7} On cross-examination, Kelty testified that he had not spoken to either of the parents.  He testified that he was aware that the parents had split up and that he knew that appellant B.B. had been incarcerated and was not seeing the children after her

incarceration.  Kelty testified that P.H. was doing well in school. When asked, he indicated that it was possible that the children could be united with a family member over a period of time. Kelty further testified that the children suffered from depression.  On redirect, he testified that the parents would have to be clean and sober before he considered involving them in counseling with their children, but that they were not. When asked if it was recommended to remove the children from their placement of 11 months when they already suffered from trauma relating to stability, Kelty testified "Absolutely not." Transcript at 39.

{¶8}    The next witness to testify was Regina Yost a clinical supervisor with Perry Behavioral Health Choices. She testified that appellant B.B. was referred to her agency in August of 2016 and that it was recommended that appellant B.B. engage in outpatient treatment. Appellant B.B. successfully completed outpatient treatment and was discharged on February 7, 2017. Appellant was also referred for follow-up treatment after her discharge. Yost testified that appellant's probation officer disclosed to her that appellant had overdosed and that her parole was going to be revoked  and that she knew this when she reassessed appellant in January of 2018. It was then recommended that appellant complete residential treatment for substance abuse disorders followed up by intensive outpatient treatment, go through individual sessions, continue mental health counseling, maintain total abstinence from all substances of abuse and continue 12-step meeting attendance. From January 25, 2018, until early February, appellant was testing negative and was waiting on a bed in an inpatient facility. However, appellant was incarcerated, so never entered the facility.

{¶9} As a result of a previous assessment in 2016, the agency had recommended that appellant abstain from all mood-altering substances, complete outpatient treatment, obtain employment, transportation and housing, attend NA meeting and be referred for mental health counseling. Yost testified that when she reassessed appellant in January of 2018, appellant had successfully completed the outpatient treatment with her agency and had reported to Yost that she was attending 12-step programs.

{¶10} Mandy Tripp, an operations specialist with American Court Services, testified that she provided drug tests for appellant who was first screened on August 12, 2016. Appellant's last screen was on February 8, 2018. Tripp testified that appellant had 37 negative screens, 13 positive screens and had missed 61 tests and missed calling in 87 times to see if she was selected for testing on a particular day. Appellant's last positive test was on January 29, 2018 and her last negative test was on February 8, 2018. She testified that appellant never contacted their office why she missed so many calls. Tripp further testified that appellant most commonly screened positive for methamphetamines but that on November 29, 2017, she tested positive for marijuana as well.

{¶11} Emily Earle, an outpatient clinician with Allwell Behavioral Health, testified next. She testified that they received referral for treatment for appellant. Appellant, who had not been discharged from counseling, was being treated for a bipolar disorder and anxiety.

{¶12} Lacy Bateson, a caseworker with Perry County Children Services, testified that she was assigned to this case. She testified that P.H. was seven years old and J.H. was four years old and that both had been in care for approximately two years.    The

children had been placed with their foster care family in June and July of 2017. Bateson testified that the paternal grandparents agreed with the placement change since they could not handle the children's behavior. The agency has had custody of the children since August 10, 2016. Bateson testified that both children had been in the custody of the agency in excess of 12 out of the last 22 months.

{¶13} Bateson testified that the agency became involved when appellant and the children's' father were stopped by police in a vehicle and meth and prescription drugs were found on appellant. The man driving the car was under the influence and appellant was charged with possession of drugs and drug instruments. Appellant signed a case plan on September 15, 2016 that required her to participate in assessment at Perry Behavioral Health Choices and follow any recommendations for further treatment, participate in mental health counseling, case management and assistance with housing, and complete random drug testing. She testified that appellant was referred to Perry Behavioral Health Choices at the beginning of the case due to positive drug screens and was re-referred on June 8, 2017 due to a positive drug screen on May 30, 2017. Appellant was referred again on October 26, 2017 due to a positive drug screen on September 29, 2017. Because appellant kept testing positive, Bateson recommended on January 26, 2018 that appellant attend inpatient treatment. Appellant was incarcerated on February 13, 2018 due to a positive drug screen and never availed herself of inpatient treatment before her incarceration. Bateson testified that appellant did not comply with the recommendation for follow-up counseling and had no housing prior to her incarceration, but was living with her parents. She testified that it was not a suitable placement for the

children because there was suspected drug use there. She further testified that appellant had problems getting transportation to her drug screens but not to visits with the children.

{¶14} Bateson testified that prior to appellant's incarceration, appellant and the chidrens' father had visitation with the children. Visitation had to be moved to the agency due to fights and arguments among the parents and positive drug screens. Most of the later visits were canceled as a result of incarceration. Bateson testified that neither parent supported the children financially over the past two years and that neither had a driver's license.

{¶15} Bateson testified that the current foster home was an adoptive placement and that the foster parents were willing to adopt the children if the permanent custody motion was granted. She testified that the children appeared bonded and attached to their foster parents and that the foster parents were receptive to her request for counseling for the children. She testified that she had observed an improvement in the children's behavior since their placement with the foster parents 11 months before. Bateson tested that P.H. was doing well in school and her grades had improved. She further testified that the relative who filed a motion for legal custody had not contacted the agency and that J.H. did not know her. The children had no relationship with this relative.

{¶16} On cross-examination, Bateson testified that appellant had in person visitation with the children as well as phone conversations with them when they were at the paternal grandparents and foster parents. She testified that visitation between appellant and her children was appropriate and that appellant and the children's father showed love and affection toward them and the children showed love and affection toward their parents.

{¶17} After the agency rested, appellant called Rodney Walter, the Chief of Police for the Village of Crooksville. He testified that appellant told him that the children's' father was following her and harassing her at 2:00 a.m. Appellant also called her relative B.Y. who testified that appellant was her niece and that she had indicated that she wanted to file for permanent custody. B.Y. testified that she tried to contact the agency three weeks prior, but that her call was not retuned. B.Y. testified that she was 61 years old and that her two grandchildren (ages 11 and 14) lived with her. B.Y. admitted that she had not had any contact with the P.H. and J.H. since they had been in foster care and, when asked how she would financially support them, testified she would do the best she could with what she had. She testified that P.H. knew who she was, but that J.H. might not remember her.

{¶18} On cross-examination, B.Y. testified that she learned that the children were in the custody of the agency around the time that appellant went to prison the last time, but that she did not come forward until May of 2018 because she did not know that she could do so. She testified that she last had contact with either of the two children a few months before appellant went to prison. She was unaware of the children's special needs and did not know where they went to school or what medical needs that they had. On redirect, she admitted that she did not have a lot of contact with the children and that she did not want to see the children adopted because she thought that appellant was going to change.

{¶19} The following is an excerpt from the trial:

{¶20} [The Court] Our first witness today was the counselor for the children who testified that these two children have severe mental health issues because of the time

they were away from the parents. That counselor has diagnosed them with extreme parentified for [P.H.] and emotional regulation - - regulatory issues for both children. [J.H.] has severe anger. This counselor has been seeing them for over a year. So there are significant issues that the children have by virtue of their time with the parents. They've been removed two different occasions: One from the grandparents and one from the parents. These children have suffered through a lot.

Were you aware of any of that?

**{¶21}** THE WITNESS [B.Y.]: I did not know this, no. I did not know that much, no.

**{¶22}** THE COURT: Were you aware of the situation when - - (INAUDIBLE) - - was arrested and how?

**{¶23}** THE WITNESS: On this last?

**{¶24}** THE COURT: In August of 2016.

**{¶25}** THE WITNESS: No. I was not aware of that.

**{¶26}** THE COURT: She [appellant] was in a car with an intoxicated driver, and the child, [P.H.] was with her.

**{¶27}** MS. TARBERT: [J.H.].

**{¶28}** THE COURT: [J.H.] was with her unrestrained in the car.

**{¶29}** THE WITNESS: See, I thought - -

**{¶30}** THE COURT: She had methamphetamine which she hid drugs in her vagina.

**{¶31}** THE WITNESS: No. I did not know that.

**{¶32}** THE COURT: You didn't know any of that?

{¶33} THE WITNESS:  No.

{¶34} Transcript at 148-149.  B.Y. testified that if she had known all of this, she would still have sought custody of the children.

{¶35} Appellant testified on her own behalf.  She testified that she had been incarcerated when she was 18 for petty theft and that she was mentally and physically abused by the children's father and was scared to leave him. She admitted that she did not obtain housing and testified that she finally broke up with the children's' father on January 3, 2018. Appellant testified that "for the most part," she kept all her drug counseling appointments and testified that she had obtained her license on August 8, 2017. Transcript at 156. She further testified that, while in prison, she took advantage of groups such as NA and AA and that she had three months remaining on her prison term. Appellant also discussed her employment history and testified that she was fired from Dollar General because the children's' father kept coming in and making scenes and that she lost her nurse's aide job due to her incarceration. The following testimony was adduced when appellant was asked if she supported her children by any means during the pendency of the case:

{¶36} A:  Clothes, shoes, coats, hats, food.  We made homemade playdough together, painted stuff, crafts, toys.  Yes, I believe I supported my children.  I would always ask them if they needed anything.  I got [P.H.] a lunch box and stuff so she could pack her own lunch.  I got her new shoes because the ones she wore to the visit were way too big so she needed new shoes for school.  I offered to get her new clothes and stuff, and Dee told me it was taken care of.  I still supplied some.  For Jack and Sue, I had gave them trash bags full.  Yes, I believe I supported my children, all besides housing.

{¶37} Transcript at 159.

{¶38} Appellant testified she celebrated birthdays and holidays with the children and that, at the time of the hearing she was receiving treatment for addiction. Appellant indicated that she had no knowledge of the children observing her having sex with the children's' father and testified that she had always provided the children with food and clothing at her parents' house. Appellant admitted that she had made mistakes and abused drugs and testified that she was working to become a better person. Appellant testified that her children were everything to her and that she loved them very much and that she wanted her children to be placed with her aunt even though the aunt had minimum contact with the children.

{¶39} On cross-examination, appellant testified that she had been taking medication for bipolar disorder, but that she stopped taking them in 2016 after her doctor discharged her for using illegal drugs. She admitted to using methamphetamine and marijuana routinely. When asked why her performance in the call-in program was so poor, appellant testified that she believed the reason was incarceration. She had no other reasons for an additional 70 calls that she missed when she was not incarcerated.

{¶40} The trial court, pursuant to an Order filed on June 28, 2018, granted Perry County Children Service's motion for permanent custody of P.H. and J.H.

{¶41} Appellant now appeals from the trial courts Order, raising the following assignments of error in both cases:

{¶42} "I.THE TRIAL COURT'S (SIC) ERRED WHEN IT FAILED TO APPOINT A GUARDIAN AD LITEM IN VIOLATION OF R.C. 2151.281 AND JUV.R. 4(B)(5)."

**{¶43}** "II. THE TRIAL COURT'S FINDING THAT THE BEST INTEREST OF THE MINOR CHILDREN WOULD BE SERVED BY GRANTING PCCS'S MOTION FOR PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

I

**{¶44}** Appellant, in her first assignment of error, argues that the trial court erred in failing to appoint a Guardian ad Litem in violation of R.C. 2151.281 and Juv.R. 4(B)(5). We agree.

**{¶45}** Whether the R.C. 2151.281(B)(1) and Juv.R. 4(B)(5) impose a mandatory duty upon the court to appoint a GAL and whether the court failed to discharge that duty constitute questions of law. We review questions of law de novo. *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 76 Ohio St.3d 521, 668 N.E.2d 889 (1996).

**{¶46}** R.C. 2151.281 states, in relevant part, as follows:

(B)(1) Except as provided in division (K) of this section, the court shall appoint a guardian ad litem, subject to rules adopted by the supreme court, to protect the interest of a child in any proceeding concerning an alleged abused or neglected child and in any proceeding held pursuant to section 2151.414 of the Revised Code. The guardian ad litem so appointed shall not be the attorney responsible for presenting the evidence alleging that the child is an abused or neglected child and shall not be an employee of any party in the proceeding.

**{¶47}** In turn, Juv.R. 4(B)(5) provides that "[t]he court shall appoint a guardian *ad litem* to protect the interests of a child or incompetent adult in a juvenile court proceeding

when:… (5) Any proceeding involves allegations of abuse or neglect, voluntary surrender of permanent custody, or termination of parental rights as soon as possible after the commencement of such proceeding."

**{¶48}** When used in a statute, the word "shall" denotes that compliance with the terms of that statute is mandatory. (Citations omitted.) *Smith v. Leis,* 106 Ohio St.3d 309, 2005-Ohio-5125, 835 N.E.2d 5, at ¶ 62.

**{¶49}** As noted by the court in *In re Adoption of Howell* (1991), 77 Ohio App.3d 80,91-92  601 N.E.2d 92. :

> Many unreported cases affirm the statutory requirement of mandatory appointment of a guardian ad litem in permanent custody cases. *92 *In re Strowbridge* (Oct. 25, 1982), Lawrence App. No. 1574, unreported, 1982 WL 3565, found that a child's right to have a guardian ad litem appointed in neglect and permanent custody proceedings is a mandatory right conferred by statute. Without such an appointment a child's due process rights in such proceedings would be severely infringed upon requiring **100 reversal of any court order subsequent thereto. *In re Lewis* (Sept. 2, 1982), Lawrence App. No. 1573, unreported, 1982 WL 3527, failure to appoint a guardian ad litem for a child in a permanent custody case is reversible error. *In re Wilson* (Nov. 12, 1981), Paulding App. No. 11–80–28, unreported, 1981 WL 6717, a guardian ad litem should be appointed for children in a permanent custody case since their interests conflict with their mother's. *In re Smith* (Dec. 20, 1978), Muskingum App. No. CA–78–25, unreported, a guardian ad litem should be appointed in a permanent

custody case under Juv.R. 4(B)(2) because the child's and the parent's interests may conflict.

**{¶50}** Based on the foregoing, we find that the trial court was required by Juv.R. 4(B)(5) and R.C. 2151.281(B)(1) to appoint a guardian ad litem for appellant's children. While there was no objection by appellant to the failure to appoint a GAL, because the right to the appointment of a guardian belongs to the child, and because the interests of the other parties to the proceeding may conflict with the child's interests, failure of a party to object cannot constitute waiver of the court's statutory duty to appoint a GAL. See, e.g., *In re Myer*, 5th Dist. Delaware App. No. 80–CA–10, 1981 WL 6316 (June 16, 1981).

**{¶51}** Accordingly, we hold that appellant's failure to request the appointment of a GAL below could not waive the court's mandatory duty to appoint a GAL to represent the interest of P.H. and J.H. We note that appellee, in its brief, agrees that the trial court erred in failing to appoint a GAL.

**{¶52}** Based on the foregoing, appellant's first assignment of error is sustained.

II

**{¶53}** Appellant, in her second assignment of error, contends that the trial court's finding that the best interest of the children would be served by a grant of permanent custody is against the manifest weight of the evidence.

**{¶54}** Based on our disposition of appellant's first assignment error, we decline to address her second assignment of error.

**{¶55}** Accordingly, the judgment of the Perry County Court of Common Pleas, Juvenile Division, granting permanent custody of P.H. and J.H. to the Perry County Children Services Agency is reversed and this case is remanded with instructions for the court to appoint a GAL to represent the interests of J.H. and P.H. and to conduct further proceedings consistent with this Opinion.

By: Baldwin, J.

Gwin, P.J. and

Wise, John, J. concur.